In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-02-00053-CR


______________________________




SAMUEL HEATH COCHRAN, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the 4th Judicial District Court


Rusk County, Texas


Trial Court No. CR2001-128




 




Before Morriss, C.J., Ross and Cornelius,* JJ.


Opinion by Justice Cornelius


*William J. Cornelius, C.J., Retired, Sitting by Assignment



O P I N I O N



 In a jury trial, Samuel Heath Cochran was convicted of attempted manufacture of
methamphetamine. Cochran elected to have the trial court set his punishment. His
punishment, enhanced by a prior felony conviction, was set by the trial court at twenty
years' confinement.

 On appeal, Cochran contends that the State did not give him proper or adequate
notice of the prior felony conviction it intended to use as enhancement; there is legally and
factually insufficient evidence to support the judgment of conviction; the trial court
erroneously admitted certain evidence; and he received ineffective assistance of counsel
at trial. We overrule all of these contentions and affirm the judgment.

 Cochran first contends the State failed to give him proper or adequate notice that
it intended to rely on the prior felony conviction to enhance his punishment if he was
convicted. The State did not allege the enhancement conviction in the indictment; instead,
the prosecutor sent a letter to Cochran's counsel on September 25, 2001, and filed a copy
of the letter with the district clerk on October 1, 2001. The letter reads as follows:

 You are hereby given notice that the State intends to plead and prove,
at the appropriate time, that Samuel Heath Cochran has been once before
convicted of a felony, Burglary of a Habitation, 1st Degree Felony, on
September 30, 1993, in CR93-171, in the 4th Judicial District Court where
the original sentence of 10 years was suspended and he was placed on 10
years probation, which was revoked August 28, 1994, and he was sentenced
to 5 years ID/TDCJ. Proof of same will increase the possible punishment to
that of a 2nd degree offense.

The Texas Court of Criminal Appeals has held that prior convictions used as
enhancements must be pleaded in some form, but not necessarily in the indictment. 
Brooks v. State, 957 S.W.2d 30, 33 (Tex. Crim. App. 1997). In Throneberry v. State, 72
S.W.3d 389, 395 (Tex. App.-Fort Worth 2002, pet. dism'd, untimely filed), the Fort Worth
Court of Appeals held that a letter mailed to defense counsel and later introduced in
evidence at the trial did not constitute a "pleading" of the enhancement.

 We conclude that the letter sent by the prosecutor to defense counsel here does not
constitute a pleading of the enhancement allegation. However, like the Fort Worth Court
of Appeals in Throneberry, we also find that the error in this regard is harmless. Cochran's
counsel admittedly received the prosecutor's letter; the letter was received twenty-two days
before the triaI began and was filed with the district clerk seventeen days before the trial
began; Cochran testified at both the guilt/innocence and the punishment stages of the trial
and freely admitted his prior conviction; neither Cochran nor his counsel contended they
were in any way surprised by the failure to allege the prior felony in a pleading; and
Cochran has demonstrated no harm that he suffered as a result of the notice being given
in a letter rather than in a pleading.

 The failure to plead the enhancement allegation creates a variance between the
pleading and the proof. There is no charge error, because the issue of punishment was
submitted to the trial court instead of the jury. For Cochran to secure a reversal for this
variance, he must show that the variance was material, i.e., one that prejudiced his
substantial rights. Gollihar v. State, 46 S.W.3d 243, 248, 258 (Tex. Crim. App. 2001). As
noted earlier, Cochran was not misled or prejudiced in any way by the State's alleging the
enhancement conviction in a letter instead of a pleading, so the variance is not material. 

 In his second point, Cochran contends the evidence is legally and factually
insufficient to support the judgment of conviction. In reviewing the legal sufficiency of the
evidence, we view the evidence in the light most favorable to the verdict and determine
whether any rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt. Kutzner v. State, 994 S.W.2d 180, 184 (Tex. Crim. App.
1999). In reviewing the factual sufficiency of the evidence, we view all of the evidence in
a neutral light to determine if the jury's finding is so against the great weight of the evidence
as to be manifestly wrong and unjust. Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim.
App. 1996); Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

 On May 23, 2001, Officer Blaine Shavers and other officers working with the
Northeast Texas Narcotics Task Force executed a search warrant at certain property
adjacent to County Road 491 in Rusk County. The property was a small parcel of land
owned by Cochran and on which was located a mobile home and a blue sleeper van
parked in the yard near the mobile home. Officers executed the search warrant at night. 
They found James Dyke and Kristy Simpson in the van. Dyke and Simpson had been
staying in the van with Cochran's permission. No one was in the mobile home when the
search was executed. The mobile home was furnished and supplied with utilities that were
turned on, furniture, bedding, and food sufficient for contemporary living. There was a pit
bulldog in the mobile home when the officers entered. The officers found in the mobile
home a substantial amount of items, materials, empty containers of pseudo-ephedrine
tablets, and various instruments commonly used to help manufacture methamphetamine,
and to smoke methamphetamine and other drugs.

 Cochran was not at the mobile home or the van when the search began. During the
search, however, officers saw Cochran approach the properties on County Road 491, slow
down, start to turn into the driveway, and then suddenly turn away from the entrance, turn
back on County Road 491, and drive away. An officer followed Cochran and stopped him
about three-fourths of a mile away. The officer arrested him and brought him back to the
mobile home.

 Cochran and his common-law wife, Tallitha Matlock, were indicted for attempted
manufacture of methamphetamine. Dyke and Simpson were also indicted for similar
offenses. Dyke and Simpson later pleaded guilty, and Dyke testified at Cochran's trial and
admitted that he and Simpson were manufacturing methamphetamine in the blue van. 
Dyke denied, however, that Cochran helped him manufacture methamphetamine.

 The State contends that Cochran admitted in his testimony at the punishment stage
of the trial that he participated with Dyke and Simpson in attempts to manufacture
methamphetamine, and that Cochran therefore is estopped from contending on appeal that
the evidence is insufficient to convict him. The State bases its contention on the
"DeGarmo doctrine," which provides that, when a defendant testifies at the punishment
stage that he committed the offense charged against him, he has, for all legal purposes,
entered the equivalent of a guilty plea and has waived any challenge to the sufficiency of
the evidence. DeGarmo v. State, 691 S.W.2d 657 (Tex. Crim. App. 1985).

 At the punishment stage, on cross-examination by the prosecutor, Cochran testified
as follows: 

 A. . . . [T]he only way I was involved in any of that was providing
precursor, and that was a trade that I would make with them people for the
product.


 Q. You would trade precursor for a product, precursor actually
being the -- what would be soaked out of the cold tablets?


 A. I guess. I don't know how they do what they do.


 Q. But you knew that you were going to get some of the product,
the final product, the methamphetamine --


 A. No, sir.


 Q. -- in exchange?


 A. No, sir, I was traded up-front in person, right off the bat,
product.


 Q. Okay. You got some methamphetamine for some more
Ephedrine tablets, cold tablets?


 A. More, I don't know.


 Q. Excuse me. You got some methamphetamine for cold tablets
that you traded; is that what you're saying?


 A. Yes, sir.


 The Texas Court of Criminal Appeals has modified its holding in DeGarmo v. State.
In Leday v. State, 983 S.W.2d 713 (Tex. Crim. App. 1998), the court held that a
defendant's admission of guilt at the punishment phase cannot be a waiver of the violation
of those guarantees of our judicial system that are "fundamental to our quality of life . . .
and at times override the truth-finding function." The court mentioned proof beyond a
reasonable doubt as one of those fundamental guarantees. Thus, although the Leday
opinion did not involve a challenge to the sufficiency of the evidence, as ours does, but
rather involved a challenge to the admissibility of evidence seized in an allegedly
unconstitutional search, the case has at least cast doubt on the continued viability of the
DeGarmo rule as it relates to sufficiency of the evidence challenges.

 We need not rely on a DeGarmo waiver or estoppel in this case, however, because
we find legally and factually sufficient evidence, apart from Cochran's admission at the
punishment stage, to support Cochran's conviction as a party to the offense of attempting
to manufacture methamphetamine.

 The mobile home and the blue van where the methamphetamine laboratory supplies
and equipment were found were both located on land owned by Cochran. Cochran gave
Dyke and Simpson permission to stay in the van. There is ample evidence that Cochran
and Matlock were living in the mobile home. Cochran testified that they had lived there off
and on for some time. He gave police the address of the mobile home as his address
when he was "booked" for the offense. The mobile home appeared to be currently lived
in, had all utilities turned on, had food in the refrigerator, and there was a pet dog in the
home when the officers entered. 

 In the search of the mobile home, the officers found the following: twelve or thirteen
"blister packs" that had contained pseudo-ephedrine tablets; a set of brass scales; a light
bulb that had been modified to use to smoke methamphetamine; numerous pieces of
tinfoil, like those used for smoking methamphetamine; a small quantity of marihuana and
marihuana seeds; tubes with burned ends; a charred pen barrel; a plastic container with
screens; an antler pipe and a ceramic cow skull, described as drug paraphernalia; a brass
valve or coupling with burned residue; and a small set of hemostats. State's witnesses
testified that all of these items were either commonly used in the manufacture of
methamphetamine or in using methamphetamine or other illegal drugs.

 In the yard, the officers found a propane tank with a green substance on the valve,
indicating it had contained anhydrous ammonia, which can be used in the manufacture of
methamphetamine; several containers; a jug of muriatic acid, used in the manufacture of
methamphetamine; a five-gallon bucket; a funnel; and a Coleman camp fuel can.
Witnesses testified that all these items can be used in the manufacture of
methamphetamine.

 In the blue van, the officers found a stenographic pad listing ingredients and the
steps necessary to manufacture methamphetamine; a coffee filter with pseudo-ephedrine
on it; a blender that contained pseudo-ephedrine; a pack of ephedrine; a spatula; a
butane-propane fuel container and other containers; coffee filters but no coffee pot; an
electric hot plate; a bottle of denatured alcohol; and assorted glassware. Witnesses
testified that all these items were associated with the manufacture of methamphetamine.

 Narcotics officers testified they listened over their radio to a live encounter between
a confidential informant and Cochran and a female that occurred at Cochran's mobile
home when the narcotics task force was gathering evidence to justify a search warrant. 
The officers heard the conversation in which the confidential informant spoke to Cochran. 
The officers could identify the voices because Cochran identified himself in the
conversation. In the conversation, Cochran told the informant that he was going to make
some methamphetamine in the future, but needed some key ingredients. Cochran asked
the informant to bring him some 2,000 pseudo-ephedrine tablets, and the informant agreed
to do so. The conversation was recorded and introduced in evidence and heard by the jury
at the trial, but was of poor quality and difficult to understand.

 The officers, however, had no difficulty hearing and relating the conversation in full
because they heard it clearly over their radio, not from the tape. This testimony by the
officers of what they heard Cochran say was admissible in evidence against him. See Tex.
R. Evid. 801(e)(2); Bingham v. State, 987 S.W.2d 54, 56 n.2 (Tex. Crim. App. 1999); Shiflet
v. State, 732 S.W.2d 622 (Tex. Crim. App. 1985); Young v. State, 10 S.W.3d 705 (Tex.
App.-Texarkana 1999, pet. ref'd); Collins v. State, 969 S.W.2d 114, 117 (Tex.
App.-Texarkana 1998, pet. ref'd).

 Cochran readily admitted using methamphetamine and marihuana, and officers
testified that, when he was arrested, he had a quantity of methamphetamine in his shirt
pocket. In his testimony at the guilt/innocence stage of the trial, Cochran testified that he
knew nothing about methamphetamine being manufactured on his property and that he
only used methamphetamine and marihuana for his personal use. 

 We find legally and factually sufficient circumstantial evidence to prove that Cochran
participated, at least as a party, in the attempted manufacture of methamphetamine. A
person is guilty as a party to an offense if, acting with intent to promote or assist the
commission of the offense, he solicits, encourages, directs, aids, or attempts to aid another
person to commit the offense. Tex. Pen. Code Ann. § 7.02 (Vernon 2003). The jury was
charged on the law of parties in this case.

 In his third point, Cochran contends the trial court erred in allowing the State to
introduce certain extraneous evidence. The evidence he complains about is (1) a
photograph of himself when he was booked at the police station; (2) marihuana found in
the mobile home during the search; (3) miscellaneous drug paraphernalia found in the
mobile home; and (4) a quantity of methamphetamine found on Cochran's person when
he was arrested.

 Cochran argues that these items constitute evidence of extraneous offenses or acts
not relevant to the charge against him, because at most, they are evidence of his using
drugs, not of attempting to manufacture methamphetamine.

 The photograph of Cochran when he was booked at the police station was
admissible. A verbal description of Cochran when he was arrested would have been
admissible, and a photographic representation was also admissible. Laws v. State, 549
S.W.2d 738 (Tex. Crim. App. 1977); Davis v. State, 504 S.W.2d 908, 910 (Tex. Crim. App.
1974); see also Denny v. State, 473 S.W.2d 503 (Tex. Crim. App. 1971).

 The methamphetamine found on Cochran when he was arrested was admissible
as same transaction contextual evidence and to show the context of the arrest. Rogers
v. State, 85 S.W.3d 359, 361 (Tex. App.-Texarkana 2002, no pet.). Moreover, Cochran
waived any complaint in this regard when he took the stand at the guilt/innocence stage
of the trial and, on examination by his own attorney, admitted that he used
methamphetamine. Stoker v. State, 788 S.W.2d 1, 12 (Tex. Crim. App. 1989). 

 The drugs and drug paraphernalia found in the mobile home, other than the
materials and equipment suitable for use in the manufacture of methamphetamine, were
admissible as circumstantial evidence to corroborate Cochran's admissions in his
conversations with the informant that he was going to make some methamphetamine. 
Moreover, evidence of a person's possession or use of one kind of drug may be relevant
to link him to other drug offenses. United States v. Williams, 957 F.2d 1238 (5th Cir.
1992); Jones v. State, 427 S.W.2d 616, 620 (Tex. Crim. App. 1968); Stroman v. State, 69
S.W.3d 325 (Tex. App.-Texarkana 2002, pet. ref'd); Castaldo v. State, 32 S.W.3d 413, 425
(Tex. App.-Waco 2000), rev'd & remanded on other grounds, 78 S.W.3d 345 (Tex. Crim.
App. 2002). And finally, the items in the mobile home that were commonly used in the
manufacture of methamphetamine were admissible as circumstantial evidence to show
Cochran's intent and preparation to manufacture methamphetamine. Tex. R. Evid. 404(b).

 In his last point, Cochran contends he was denied effective assistance of counsel. 
To prevail on an ineffective assistance of counsel claim, Cochran must show that his
counsel's representation fell below an objective standard of reasonableness and that his
counsel's deficient performance prejudiced his defense to the extent that, if his counsel's
representation had not been deficient, the result of the trial would have been different. 
Strickland v. Washington, 466 U.S. 668 (1984); Hernandez v. State, 726 S.W.2d 53 (Tex.
Crim. App. 1986). 

 Cochran bases his contention of ineffective assistance on his charges that his
counsel (1) failed to consult him as to whether he wanted to submit the issue of
punishment to the jury or to the trial court; (2) failed to call witnesses at the punishment
stage; and (3) failed to argue to the trial court at the punishment stage that Cochran should
be placed on community supervision.

 As to the first contention, there is nothing in the record to indicate that Cochran's
counsel failed to consult him on the issue of whether to submit the punishment issue to the
jury or to the trial court. 

 There is also no evidence in the record showing whether there were any witnesses
who could give testimony at the punishment stage that would be relevant or favorable to
Cochran.

 There is also a complete absence of evidence as to counsel's strategy in failing to
argue to the court for community supervision. In the absence of some evidence of
counsel's trial strategy, we must assume that his actions were justified by sound trial
strategy. Garcia v. State, 57 S.W.3d 436 (Tex. Crim. App. 2001). Overall, defense
counsel presented a well-based and persuasive defense. He cross-examined the State's
witnesses thoroughly and effectively, and generally presented an effective defense. If
counsel's decision not to argue for community supervision was not reasonable, it was an
isolated instance, and we conclude that it was not such as to constitute ineffective
assistance, considering the totality of the circumstances.


 For the reasons stated, we affirm the judgment.


 William J. Cornelius*

 Justice


*Chief Justice, Retired, Sitting by Assignment


Date Submitted: February 3, 2003

Date Decided: April 18, 2003


Publish



acing, div.MsoNoSpacing
 {mso-style-priority:1;
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-parent:"";
 margin:0in;
 margin-bottom:.0001pt;
 mso-pagination:none;
 mso-layout-grid-align:none;
 text-autospace:none;
 font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;}
span.FootnoteTextChar
 {mso-style-name:"Footnote Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Footnote Text";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-fareast-font-family:Calibri;
 mso-fareast-theme-font:minor-latin;
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Times New Roman","serif";
 mso-ascii-font-family:"Times New Roman";
 mso-hansi-font-family:"Times New Roman";
 mso-bidi-font-family:"Times New Roman";}
span.SpellE
 {mso-style-name:"";
 mso-spl-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 mso-ascii-font-family:Calibri;
 mso-ascii-theme-font:minor-latin;
 mso-fareast-font-family:"Times New Roman";
 mso-fareast-theme-font:minor-fareast;
 mso-hansi-font-family:Calibri;
 mso-hansi-theme-font:minor-latin;
 mso-bidi-font-family:"Times New Roman";
 mso-bidi-theme-font:minor-bidi;}
.MsoPapDefault
 {mso-style-type:export-only;
 margin-bottom:10.0pt;
 line-height:115%;}
 /* Page Definitions */
 @page
 {mso-page-border-surround-header:no;
 mso-page-border-surround-footer:no;
 mso-footnote-separator:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") fs;
 mso-footnote-continuation-separator:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") fcs;
 mso-endnote-separator:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") es;
 mso-endnote-continuation-separator:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:1.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") f1;
 mso-first-header:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
@page WordSection2
 {size:8.5in 11.0in;
 margin:2.0in 1.0in 1.0in 1.0in;
 mso-header-margin:2.0in;
 mso-footer-margin:1.0in;
 mso-even-header:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") eh1;
 mso-header:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") h1;
 mso-even-footer:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") ef1;
 mso-footer:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") f2;
 mso-first-header:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") fh1;
 mso-first-footer:url("6-10-088-CR%20Caldwell%20v.%20State%20FINAL%20mtd_files/header.htm") ff1;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
-->











 
 
 
 
 
 
 




 

 

 

 

 

 

 

 

 

                                                         In
The

                                                Court
of Appeals

                        Sixth
Appellate District of Texas at Texarkana

 

                                                ______________________________

 

                                                             No. 06-10-00088-CR

                                                ______________________________

 

 

                                      LUTHER CALDWELL,
Appellant

 

                                                                V.

 

                                     THE STATE OF TEXAS, Appellee

 

 

                                                                                                  


 

 

                                      On Appeal from the 202nd Judicial District Court

                                                             Bowie County, Texas

                                                       Trial Court
No. 08F0846-202

 

                                                    
                                              

 

 

                                          Before Morriss, C.J.,
Carter and Moseley, JJ.

                                                        Opinion by Justice Moseley

Dissenting Opinion by Justice Carter








                                                                   O P I N I O N

 

            After
Luther Caldwell was convicted by a Bowie County jury for the murder of Greg
Thomas and sentenced to life imprisonment, he has appealed.  Caldwell complains that the trial court erred
in limiting the evidence Caldwell was allowed to present regarding a possible
alternative perpetrator of the charged murder and that the trial court should
have granted Caldwells motion for new trial based on an allegation of the
discovery of new evidence.  After
reviewing the record and considering the parties oral arguments, we find no
reversible error and affirm the judgment. 


The Shooting

 

            The
States central witness was a sometime prostitute, Donna Taylor, who testified
that she was personally acquainted with Caldwell.  Taylor indicated that she had previously lived
with Caldwell, had regularly purchased illicit drugs from him (including a
purchase on the morning of the shooting), and had previously driven Caldwells
Nissan Sentra, which she alleged that Caldwell had
driven while shooting Thomas. 

            The
crux of Taylors testimony was that on the night of September 12, 2007, she was
walking along Nettie Street in Texarkana and encountered Thomas, whom she knew.
 As Taylor and Thomas walked along
together, Taylor saw Caldwell driving his Sentra.[1]  Since Taylor wanted to purchase more crack
cocaine, she attempted to attract Caldwells attention.  At that time, she observed Caldwell point the
barrel of a gun out the cars passenger window, shoot Thomas, and then drive
away.  Taylor, frightened, ran and hid in
an alley, emerging after about ten minutes. 
A few blocks from the location of the shooting, she encountered another
person familiar to her, Johnny Ward. 
Taylor told Ward she had just seen someone get shot, but testified she
did not tell Ward the identity of the victim. 
A short time later, Taylor approached a police officer and told him she
had seen something bad.  At the police
station, Taylor told investigators that Caldwell was the shooter, and she
identified a picture of him in a photographic line-up.  

            In
her first statement to police the night of the killing, Taylor said she saw the
gun barrel protruding from the passenger window and repeated that at the time
of trial.  On cross-examination, Caldwell
established a temporary change in her story, pointing out that in 2008, Taylor
had told the police that the gun protruded from the drivers side window and
not the passengers side window.  Taylor
acknowledged having misspoken in that intervening statement to police, and
reaffirmed that the gun barrel projected from the passengers side window when
Caldwell drove past and shot Thomas.  

            In
the hours after the shooting, even though Taylor had given a positive
identification of Caldwell as the perpetrator, police still rounded up other
persons of interest in the neighborhood and brought them in for questioning;
those persons brought in for questioning included Ward and a companion, Curnediles Larry, both of whom were swabbed to test for
gunshot residue.  Gunshot residue tests
were negative for both men.  As one
detective was swabbing Ward, Ward inquired about the purpose of the test and,
in particular, regarding the length of time which could pass between a test
subject firing a gun and the ability of the test to detect a residue of
gunpowder.[2]  The chief investigator for the case,
Detective Scott Sartor, interviewed both Ward and Larry, found their alibis
persuasive to him,[3] and
concluded that neither man had any connection to Thomas slaying.  

            Leonard
Bolton testified[4] that
the day after the shooting, another person (Little Charles Ray) brought
Caldwell to Bolton, and told Bolton that Caldwell had shot Thomas.  Bolton said that although Caldwell was
present and overheard Rays statement, Caldwell made no attempt to deny the
crime.  Bolton (who admitted having
engaged in the sale of illicit drugs with Caldwell) stated that Caldwell
enlisted Boltons assistance in leaving Texarkana.  Bolton said that Caldwell related that he
wanted to avoid the Texarkana bus station because he feared that police
monitored that station with drug-detection dogs.  Bolton chauffeured Caldwell to Atlanta,
Texas.  Missing the bus there, they
proceeded south to the bus station in Marshall, Texas, from whence Caldwell
departed for Stockton, California.  Bolton
said that throughout the drive to the various bus stations, Caldwell said he
had fucked up, but Bolton would not allow Caldwell to explain what he meant
by that.[5]  Shortly after arriving in Stockton,
California, Caldwell called Bolton to tell him that he had arrived; in that
conversation, Caldwell told Bolton that he had seen his picture being broadcast
on a television in the Marshall bus station as a wanted man.  On at least two occasions, Bolton sent money
to Caldwell in California.  Later, Bolton
contacted police and Caldwell was located and arrested in California.   

            Caldwell
testified in his defense.  Although he
admitted to being a drug dealer, he denied that he was a murderer, denying that
he had anything to do with the shooting of Thomas.  His explanation for going to California the
day after the killing was that a shooting in the neighborhood generated the
wrong kind of attention for his drug business, and he also intended to attend
his brothers wedding.  

Caldwells Alternative Perpetrator
Theory

            

            Caldwells
defensive theory focused on Ward: 
through cross-examination of the States witnesses, Caldwell suggested
Ward was the killer.[6]  The trial court limited the evidence Caldwell
was allowed to present to the jury, precluding him from showing a possible
motive Ward may have possessed to kill Thomas, as well as a short document
(generated by prosecutors or law enforcement on an interagency computer
program), which suggested Ward had killed Thomas.  This limitation on the evidence Caldwell was
allowed to present is the source of one of Caldwells complaints on appeal.  We affirm the trial courts ruling.

            Evidence
Not Permitted by the Trial Court

 

            Four
or five days before Thomas was killed, Ward was alleged to have been involved
in a shooting in the same neighborhood where the instant killing occurred.  In that case, Ward was alleged to have shot a
man who was standing with Thomas and a third man.  Thomas gave a statement to police in which he
identified Ward as the shooter in that case. 
Caldwell asked the trial court to allow him to present this evidence of
accusations about Wards earlier shooting activity as evidence that he (Ward)
had a motive to kill Thomas, a witness to the prior shooting.  The trial court refused to allow this
evidence, although the jury was permitted to hear two police officers testify
that Ward was initially considered a suspect, and was brought in for
questioning in the hours immediately after the shooting.[7]  

            The
trial court also precluded Caldwell from presenting evidence:  a printout from a computer program called
Able Term.  From the record and
statements from the State at oral argument, Able Term appears to be a software
program accessible by law enforcement officers, the prosecutors office, and
the clerks office which is maintained for the purpose of keeping track of
criminal cases.  Caldwell wanted to
present to the jury a printout of an entry in Able Term, which seemed to refer
to the allegation of Wards shooting at Thomas and two other men a few days
before Caldwell was alleged to have killed Thomas.  The entry stated in full:

 

1.  Date / Time: 
11/20/07

 

2.  Event Code: 
NP  (STATE DECLINED PROSECUTION)

 

3,  Comment: 
DEFENDANT CHARGED W/ MURDER OF THE ONLY WITNESS IN THIS CASE

 

At the hearing outside the presence
of the jury where Caldwell presented this Able Term evidence, the State also
proffered a copy of a letter sent from the Bowie County District Attorneys Office
to Caldwells counsel, stating that while Ward had initially been a suspect in
Thomas killing, he had never been charged with that offense.  More particularly, the States letter stated
that the relevant Able Term entry was made by the District Attorneys Office,
that the State declined prosecution in the earlier shooting, and that the State
has no exculpatory evidence related to the prosecution of Luther
Caldwell.  Although he was an initial
suspect, Johnny Ward, Jr. was never charged with the murder of Gregory
Thomas.  

            The
Law on Alternative Perpetrators

 

            A
criminal defendant is entitled to present evidence that another party is
responsible for the crime alleged against the defendant; but the defendant
must show that his proffered evidence regarding the alleged alternative
perpetrator is sufficient, on its own or in combination with other evidence in
the record, to show a nexus between the crime charged and the alleged
alternative perpetrator.  Wiley v. State, 74 S.W.3d 399, 406 (Tex.
Crim. App. 2002).[8]  A defendant must do more than offering
unsupported speculation of another, alternative perpetrator of defendants
charged offense.  Id. at 407 n.23 (quoting United
States v. McVeigh, 153 F.3d 1166, 1191 (10th Cir. 1998)).

            The
appellant in Dickson v. State, 246
S.W.3d 733 (Tex. App.Houston [14th Dist.] 2007, pet. refd),
likewise attempted to present evidence of an alternative perpetrator.  In that case, Dickson was charged with
aggravated robbery.[9]  Dickson sought to present evidence that
another person committed the charged offense; following that strategy, he was
allowed to present evidence that the proposed alternate suspect resembled
Dickson, lived in the area of the robberies, and had been convicted of
robberies close in time to the charged offense. 
However, the trial court refused to allow Dickson to present
photographic evidence that the alternative perpetrator resembled Dickson or
introduce evidence of judgments of conviction showing the proposed alternative
perpetrator had committed robberies one day before and twenty-two days after
the charged offense.  Id. at 23738.  

            The
appellate court in Dickson found that
while the evidence Dickson sought to admit was relevant to the core issue of
the case (i.e., the identity of the perpetrator), the defense nonetheless
failed to present any evidence connecting the alleged alternative perpetrator
to the charged offense.  

In
order for a court to conclude there is a nexus between an alleged alternative
perpetrator and the offense-at-issue, there must be something more than
evidence that a person other than the criminal defendant was committing similar
crimes around the time of the offense-at-issue, the evidence must connect the
alleged alternative perpetrator to the specific offense.

 

Id. at 741.  Therefore, the evidence was properly
excluded.  Id.[10]  

 

            The
theory that Ward had a motive to want Thomas (a witness to the previous
shooting) dead, combined with Wards alleged involvement in a shotgun shooting
in the same neighborhood just a few days prior to the instant crime and Wards
presence in the area near the time Thomas murder occurred could be deemed to
create some degree of nexus linking Ward to the killing of Thomas.  We review an exclusion of evidence for abuse
of discretion.  Martin v. State, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005).  A trial court abuses its discretion if its
decision is outside the zone of reasonable disagreement or if it acts without
reference to guiding rules or principles.  Montgomery
v. State, 810 S.W.2d 372, 380, 391 (Tex. Crim. App. 1990) (op. on rehg).  When the
trial court made its ruling, excluding the evidence of Wards earlier shooting
incident and the Able Term document, it specifically relied upon the analysis
of Wiley.  The trial court found that while there was
some relevance in the proffered evidence, there was insufficient evidence to
establish the nexus required by Wiley.  Citing Taylors testimony that Ward was not
at the scene, was not the shooter, and that Caldwell was the shooter, the trial
court found no such nexus and that introduction of the evidence urged by
Caldwell would 

require
a mini-trial, which would require the State to present witnesses to prove or
disprove what happened in the other case, and that would cause confusion to
this jury, and that theres not a sufficient nexus to tie [Ward] to it to make
the probability great enough to outweigh that prejudicial effect.

 

Here, the trial court clearly based
its ruling on Texas Court of Criminal Appeals precedent and the Texas Rules of Appellate
Procedure.  We find the trial courts
ruling was in the zone of reasonable disagreement, and overrule Caldwells
point of error.

Caldwells Motion for New Trial

 

            Caldwell
filed a motion for new trial, which was overruled by operation of law.[11]  In that motion, he claimed that the State
failed to disclose that witness Bolton had been arrested for felony deadly
conduct and misdemeanor assault causing bodily injuryfamily violence.[12]  Caldwell argued that absent this information,
he was unable to fully impeach Boltons testimony.  On appeal, he claims his motion for new trial
should have been granted.  

            We
begin by addressing a point of procedure. 
The motion for new trial does not request a hearing, and there is nothing
in the clerks record indicating Caldwell presented the motion to the trial
court or requested a hearing.  See Tex.
R. App. P. 21.8; Rozell v. State, 176 S.W.3d 228, 230 (Tex.
Crim. App. 2005); Carranza v. State,
960 S.W.3d 76, 7879  (Tex. Crim. App.
1998) (present means deliver motion to court or bring to courts
attention).  A motion for new trial must
be presented to the trial court in a timely fashion.  See
Tex. R. App. P. 21.6.  

            Caldwell
directs us to a letter his counsel sent to the trial court, which says in part,
I filed a Motion for New Trial . . . I was wondering how you wanted to handle
this matter.  Please let me know if you
want to set this matter for hearing or simply rule on the motion.[13]  A defendant filing a motion for new trial must
present the motion to the trial court and obtain a hearing before the motion is
overruled by operation of law.  See Rozell,
176 S.W.3d at 231; see also Carranza, 960 S.W.3d at 7879 (present
means deliver motion to court or bring to courts attention).  Mere filing of the motion for new trial with
the trial court is insufficient to constitute presentment.  Carranza,
960 S.W.2d at 78.

            As
in Rozell,
the appellant here did not specifically request the trial court hold a hearing
on the motion for new trial, leaving it to the trial courts discretion as to
whether a hearing was to be held or whether the motion could be overruled by
operation of law.  Similarly, Rozell failed to affirmatively request a hearing in his
motion, an action which gave the trial court the option to choose between
conducting a hearing or ruling on the motion without a hearing.  [W]ithout a more
specific request, [this] left to the trial courts discretion whether a hearing
should be held.  Rozell, 176 S.W.3d at 231.[14] 

            Notwithstanding
Caldwells failure to present his motion, request a hearing, and obtain a
ruling on his motion for new trial, as required by Rules 21.6 and 21.8, we find
his motion would nonetheless have been unsuccessful.  The basis of the motion for new trial was
newly discovered evidence that States witness Bolton had an arrest, which was
not disclosed to the defense.  Caldwell
claims that had he known about this arrest, he could have used that information
in cross-examining Bolton to impeach him. 
We disagree.

            Specific
acts of misconduct are admissible to impeach a party or witness only if both
the crime was a felony or involved a crime of moral turpitude, regardless of
punishment, and the trial court determines that the probative value of the
evidence outweighs its prejudicial effects.  See Delk v. State, 855 S.W.2d 700, 704 (Tex.
Crim. App. 1993); Reyna v. State, 99
S.W.3d 344, 348 n.2 (Tex. App.Fort Worth 2003, pet. refd);
see also Tex. R. Evid. 609(a).  An exception to the prohibition against
impeachment through a prior conviction arises when the testimony of a witness
during direct examination opens the door or leaves a false impression with
the jury as to the extent of the witness prior arrests, convictions, charges,
or trouble with the police.  See Delk, 855 S.W.2d at 704; Reyna, 99 S.W.3d at 349.  Otherwise inadmissible evidence may be
admitted if the party against whom the evidence is offered opens the door,
provided the evidence does not stray beyond the scope of the invitation.  Feldman
v. State, 71 S.W.3d 738, 75556 (Tex. Crim. App. 2002).  An exception to that general rule against
admission of unadjudicated bad acts arises when a
witness leaves a false impression as to the extent of either his prior (1)
arrests, (2) convictions, (3) charges, or (4) trouble with the police.  Prescott
v. State, 744 S.W.2d 128, 13031 (Tex. Crim. App. 1988); Hall v. State, 161 S.W.3d 142, 156 (Tex.
App.Texarkana 2005, pet. refd).

            Caldwells
theory is that Bolton opened the door by giving a false impression about his
arrest history.  When the State called
Bolton to the stand, they questioned him about a felony controlled substance
conviction from 1990 or 1991.  Bolton
acknowledged the conviction, for which he had been placed on community
supervision.  Later, on cross-examination,
Caldwell asked what led Bolton to contact police and testify for the
State:  

            Q         [Defense
Attorney]  Okay.  At the time that you gave the information on
Mr. Caldwell, were you on probation?

 

            A         [Bolton]  No, sir.

 

            Q         Have
you been promised any Crime Stoppers reward or anything of that nature?

 

            A         
No, sir.

 

            Q         What
was your motivation on turning in Mr. Caldwell?

 

            A         Youve
got to tell me what you mean by motivation.

 

            Q         Well,
I mean, why did you -- ?

 

            A         What
was the reason why?

 

            Q         Why
did you do it? Yes, sir.

 

            A         Because
I seen on TV a show called First 48, and if you help somebody that did
something wrong you can go to jail for it.

 

            Q         So
you thought your helping out [testifying for the State] would get you out of
trouble, huh?

 

            A         It
didnt.  

 

            Q         It
didnt?  Have you been charged?

 

            A         I
dont know.

 

            Q         Have
you ever been arrested?

 

            A         Yeah,
I done been arrested before.

 

            Q         You
have?

 

            A         Yes,
I have been arrested.  I just told you I
was on probation for drugs in 91.

 

            Q         Okay.  Have you been arrested for aiding and
abetting Mr. Caldwell? 

 

            A         No,
sir.

 

            Q         When
you were on probation, did you do any jail time or anything like that?

 

            A         I
went to jail - - they arrested me and I went to jail, and then I got out.  I got out of jail - - I went to jail when I
got arrested.

 

            Q         After
being placed on probation, did you go to jail?

 

            A         No,
sir. 

 

            Q         The
morning that you delivered Mr. Caldwell to the bus station, did he have - - was
he in possession of drugs?

 

Caldwell argues that Bolton
effectively said that he had only been arrested for the drug offense which led
to his 1990 or 1991 conviction.  There,
Caldwell believes he should have been able to cross-examine and impeach Bolton
with evidence that he had also been arrested in 2008 for deadly conduct and
assault.  See Brady v. Maryland,
373 U.S. 83, 87 (1963); United States v.
Bagley, 473 U.S. 667, 67677 (1985) (Brady
evidence includes evidence that can be used to impeach States witnesses); Arroyo v. State, 117 S.W.3d 795, 796 n.1
(Tex. Crim. App. 2003).

            Bolton
did not create a false impression that he had no other arrests than that
involved in his old felony conviction. 
Defense counsel asked Bolton if he had been arrested or charged with
assisting Caldwell in his flight from Bowie Countys jurisdiction.  Yes, counsel asked Bolton, Have you ever
been arrested? but that was clearly in the context of the line of questioning
about any charges for hindering apprehension regarding Boltons involvement
with Caldwell after the instant murder.  It
is important to look at the questions in context of the record. In determining
whether a false impression was created, . . . we must examine the testimony in
context, rather than in a vacuum.  Moore v. State, 82 S.W.3d 399, 407 (Tex.
App.Austin 2002, pet. refd), overruled on other grounds by Taylor v. State, 268 S.W.3d 571, 587
(Tex. Crim. App. 2008) (citing Prescott
v. State, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988)).  Bolton may have misunderstood this question,
as evidenced by his response, Yes, I have been arrested.  I just told you I was on probation for drugs
in 91.  Alternatively, he could have
just as easily been replying that he had already said that he had been
arrested, giving his testimony about the drug arrest.  Caldwell did not ask about other charges
except as they pertained to arrests arising from circumstances pertaining to
this case.  Caldwells follow-up question
again refers to any charges related to the instant case:  Have you been arrested for aiding and
abetting Mr. Caldwell?  

            In
Prescott, the defendant was
questioned about affidavits made by two witnesses who corroborated Prescotts
version of events.  When asked about the
fact that the affidavits were signed and notarized in his attorneys office on
the same day, Prescott said, Well, Im -- this
is my first time of going through this.  Hopefully my last.  In other words, I dont -- Im not sure about
the legal lawyer (pause) whatever.  Prescott, 744 S.W.2d at 130 (emphasis
added by Texas Court of Criminal Appeals). 
The Texas Court of Criminal Appeals found Prescott had not opened the
door to impeachment with this other offense.

The
appellants response, this is my first time of going through this.  Hopefully, my last, cannot be examined in a
vacuum.  Yet such an analysis would
completely ignore both the question which the appellant was attempting to
answer and the context in which the response was given. 

 

Id. 
Prescotts answer was in direct response to the posed question, and
restrictive, responsive, reasonable and understandable.  Id.

            As
in Prescott, Boltons answers to
defense counsels questions must be viewed in context; as such, Bolton did not
create a false impression about his arrest history and did not open the door to
impeachment with any cross-examination not expressly allowed by Rule 609.  Thus, even if the State had tendered to
Caldwell Boltons 2008 arrest,[15]
Caldwell would not have been able to use that arrest information to impeach
Bolton.[16]

            There
was no error in the trial courts failure to hold a hearing, or rule on,
Caldwells motion for new trial.  We
overrule Caldwells second point of error and affirm the trial courts judgment
and sentence.  

            

 

                                                                        Bailey
C. Moseley

                                                                        Justice




 

 

DISSENTING
OPINION

 

            The
jury was not allowed to hear that Johnny Ward shot at a group including Greg Thomas,
a few days before this incident.  Thomas
had identified Ward as the shooter and had given such a statement to the
police.  Both the original aggravated
assault and the murder occurred a few days apart near the same place.  So at the time Thomas was killed, he was the
eyewitness for an aggravated assault for which Ward was arrested.  If Thomas were not available, Ward would be
the beneficiary.  According to Taylor,
within ten minutes Ward was seen a few blocks from the scene of the
murder.  The jury heard none of this, but
only heard that Ward was brought in and questioned for this murder, but was
released.

            It
is unclear when the Able Term entry was made (which inaccurately stated that
Ward was  charged with this murder).  But, if this evidence had been admitted, a
strong argument could have been presented that at the time the notation was
entered, a representative of the District Attorneys Office (the admitted
source of the entry) believed that Ward was not prosecuted for the aggravated
assault because he had been charged with the murder of the only witness in
this case (Thomas).  

            Caldwell
should have been allowed to present this evidence showing the connection of
Ward to Thomas and the fact that a representative of the District Attorneys Office
had at one time believed that the only reason Ward was not charged for the
first assault was that he had been charged with the murder of Thomas.  

            These
facts are completely different from cases such as Dickson, where the excluded evidence was a comparison of
photographs and judgments of prior offenses. 
In Wiley, the defense admitted
the person proposed as the alternate perpetrator was too simple to plan and
execute an elaborate arson even though he had recently been in and around the
property.  

            The
Texas Court of Criminal Appeals has determined that alternative perpetrator
evidence is inadmissible unless a nexus is shown between the crime charged and
the alleged alternative perpetrator.  A
nexus is a connection.  The evidence here
reveals a sufficient nexus to allow this evidence to be presented. 

             Since the evidence was relevant, it should be
admitted unless the prejudicial effect substantially outweighs its probative
value.  Tex.
R. App. P. 403.  The trial court
found that to allow this evidence would require a mini-trial of the aggravated
assault charge and cause confusion.  I
see no reason for a mini-trial on the assault charge; the identifying witness
was dead.  The pertinent issue is not
whether Ward was in fact guilty of the previous assault charge, but that Thomas
had identified him as the assailant, that Ward was in the area where it
occurred, and at one time, a representative of the District Attorneys Office
thought the charge for assault had not been pursued against Ward because he
(Ward) murdered the eyewitness (Thomas). 
I do not find this evidence to be unfairly prejudicial.  The majority opinion supports its conclusion
by observing that the trial court cited Taylors contrary testimony that Ward
was not the murderer for its decision to exclude Caldwells proffer.  The fact that contrary evidence is presented
cannot be a determining factor in the decision to exclude evidence; it was the
function of the jury to consider this evidence together with the States
evidence of guilt, resolve any conflicts, and then make its determination.  

            Finally,
the court should examine if the error was harmful.  First, it must be determined if this error was
one of a constitutional violation. 
Exclusion of evidence may be a constitutional violation if (1) a state
evidentiary rule categorically and arbitrarily prohibits the defendant from
offering relevant evidence that is vital to the defense; or (2) when a trial
court erroneously excludes relevant evidence that is a vital portion of the
case and the exclusion effectively precludes the defendant from presenting a
defense.  Ray v. State, 178 S.W.3d 833, 835 (Tex. Crim. App. 2005) (citing Potier v. State, 68 S.W.3d 657, 65962 (Tex.
Crim. App. 2002); Wiley v. State, 74
S.W.3d 399, 405 (Tex. Crim. App. 2002)). 
Here, only the second category is involved.  

            Was
Caldwell precluded from presenting a defense on a vital portion of the
case?  Evidence was introduced by the State
that Ward, along with another, was brought in after the murder for
questioning.  This was portrayed as being
common to bring in everybody they can.  Gunshot residue was taken from Ward, at which
time Ward inquired as to how long residue would remain on the hands.  Ward was fully cooperative. On
cross-examination, it was established that Ward was found at a convenience
store somewhere close to the scene of the murder.  Caldwell testified, but had no evidence
concerning Wards possible involvement in the murder.  

            This
evidence does not present Caldwells evidence of Wards possible involvement in
the murder.  It was portrayed as routine
police investigation that in effect cleared any consideration of Ward as the
perpetrator.  The evidence that would
have been vital to this defense was the fact that Thomas had identified Ward as
the assailant in the previous aggravated assault and that at one time, a
representative from the District Attorneys Office thought Ward had been
charged with the murder of Thomas.  The
erroneous exclusion of evidence prevented Caldwell from presenting his only
real defensethat Ward, who was near the scene of the murder, had a strong
motive in the demise of Thomas.  Consequently,
this is error of a constitutional nature, and we must reverse unless it is
determined beyond a reasonable doubt that the error did not contribute to the
conviction or punishment.  Tex. R. App. P. 44.2(a).

            Without
the jury hearing any inculpatory evidence concerning
Ward, it was permitted to hear that the investigating officers had cleared him
of any wrongdoing.  To determine, beyond
a reasonable doubt, that the exclusion of this evidence would not contribute to
the conviction, we must be assured the jury would not believe this proffered
evidence linked Ward to the murder. 
While no one can ever know what a jury would have done if provided with
other evidence, the trial courts ruling prevented the jury from even
considering this relevant evidence.  I do
not think it is reasonable to conclude, beyond a reasonable doubt, the error
did not contribute to the conviction. 
The judgment should be reversed for a new trial.  

            I
respectfully dissent. 

 

 

 

                                                                        Jack
Carter

                                                                        Justice

 

 

Date Submitted:          September 28, 2011

Date Decided:             October 21, 2011

 

Publish

 

 











[1]On
the stand, Caldwell said he did not own the Sentra on
the date of the killing.  





[2]Part
of Caldwells defensive theory was to stress Wards curiosity while being
questioned by police.  Wards questions
were described by Detective William Buttram:  

 

Ward
asked me while I was taking [the swab for gunshot residue] what it was good
for, or how long it was good for, what I was doing, and I didnt understand
what he was asking.  He wanted to know
how long it would last, I guess, if hed fired a gun, you know, a year ago if
it was still there is what I presumed. 

 





[3]The
nature of these alibis was not developed. 

 





[4]Caldwell
was tried for the killing a month before the trial, which resulted in his
conviction:  that first trial resulted in
a mistrial where the jury could not reach a unanimous verdict.  Bolton did not testify at the first
trial.  





[5]Bolton
was evidently trying to limit his knowledge of the crime and his own
culpability.  In acknowledging he could
be indicted for his involvement, and explaining why he would not let Caldwell
say more, Bolton said, I didnt want to know about it.  I didnt want to be -- I didnt want to be
here [testifying] today.  

 





[6]In
law enforcement circles, this is often known as the SODDI (some other dude did
it) defense.  James v. State, 48 S.W.3d 482, 486 (Tex. App.Houston [14th Dist.]
2001, no pet.).





[7]Officer
Jeff Johnston and Detective Buttram testified that
Ward and Larry were brought to the police station for questioning in the hours
after the shooting.  Buttram
said this was common procedure, [Officers] bring in everybody they can.  Buttram said he
believed Ward and Larry were located at a convenience store close to the murder
scene; he was not sure exactly how close, though.  On cross-examination, Caldwell established
that when officers spoke to Ward, he did not mention having spoken to Taylor
that night.  





[8]Wiley,
charged with burning down his own restaurant, sought to introduce evidence that
another person, a known fire-starter, had been ejected from the restaurant
a few days prior to the fire for acting crazy, striking matches, and removing
his shirt.  74 S.W.3d at 403, 405.  Wiley also wanted to put on evidence this
fire-starter was seen across the street from the restaurant when it burned.  However, the defense also conceded to the
trial court that this alleged alternative perpetrator likely lacked the
intellectual capacity to plan and execute the fire.  74 S.W.3d at 404.  Wiley instead wanted to raise the possibility
this third person may have acted in concert with another arsonist.  The Texas Court of Criminal Appeals agreed
with the trial court that Wileys proffered evidence was properly excluded
under Rule 403.  See Tex. R. App. P.
403; Wiley, 74 S.W.3d at 407.

 





[9]In
one evening, four people were robbed at a Houston apartment complex, in three
separate incidents.  Dickson was charged
with robbery of one person, and the State presented evidence of another victim
as proof of identity of the robber. 
Dickson then presented the fourth victim, who testified Dickson was not
his robber. 





[10]Caldwell
directs us to United States v. Stevens,
935 F.2d 1380, 1405 (3rd Cir. 1991). 
That court found evidence of another person committing a crime similar
to that with which Stevens was charged admissible where:  two armed robberiesthat for which Stevens
was charged and anotheroccurred within a few hundred yards from each other;
between 9:30 and 10:30 p.m., with a handgun; perpetrated upon military
personnel; by a black assailant, who was described similarly by the
victims.  Stevens sought to present
testimony from the black victim of the uncharged crime, who would say that
Stevens was not his attacker.  Stevens
reasoned that because of the similarity between the crimes, they were likely
committed by the same person; and the (non)identification of the black victim
of the uncharged crime was more accurate/credible than the identification of
the white victims in the charged crime, because same-race identifications are
more accurate than cross-racial identifications.  Id. at
1401, 1405.  The court found Stevens
reverse 404(b) evidence admissible, based on the similarities of the crimes
and the testimony regarding cross-racial identification.  Id. at
140406.  We take note of Stevens, but in light of the particulars
of that case, including the expert testimony, and its differences from the case
before us, do not find the Third Circuit case compelling. 





[11]See Tex.
R. App. P. 21.8(c).  

 





[12]This
information is supplied in the motion for new trial, to which is attached an
offense/arrest report from May 2008, which indicates officers responded to a
report of shots fired; other than Bolton being arrested for the two offenses,
there is no indication formal charges were filed.

 





[13]This
letter is attached to Caldwells motion to supplement the record on
appeal.  In the same motion, he asked to
supplement by including the reporters record from Caldwells first trial, the
mistrial.  He also asks that the attached
letter to the trial court be included in the supplemented record.  We granted Caldwells motion to supplement
the appellate record, but see no indication Caldwell sent a supplemental
request to the district clerk to supplement the record with the requested correspondence.  It is the appealing partys burden to ensure
that the record on appeal is sufficient to resolve the issue he presents.  Guajardo v. State, 109 S.W.3d 456, 462
n.17 (Tex. Crim. App. 2003).  This
Courts letter to the parties stating that Caldwells motion to supplement had
been granted was sent to Caldwells counsel, the court reporter, and a courtesy
copy was sent to the State.  It was
Caldwells responsibility to request specific items for inclusion in the
clerks record.  See Tex. R. App. P.
34.5.  A document not contained in the
clerks record is not properly before this Court for consideration.  See
Yarbrough v. State, 57 S.W.3d 611, 618 (Tex. App.Texarkana 2001, pet. refd).  In the
interest of justice, however, we will consider whether Caldwells letter to the
trial court sufficed to request a hearing on the motion for new trial.





[14]Caldwells
counsel candidly acknowledged at oral argument his letter to the trial court
was likely insufficient to request a hearing. 
This Court always appreciates and commends candor on the part of
counsel. 





[15]There
is no suggestion, in the record or by Caldwell, of any bad faith on the part of
the State. 

 





[16]It
would have been impermissible for Caldwell to attempt to maneuver Bolton into
opening the door or making a false representation of his arrest history on
cross-examination.  See Lopez v. State, 928
S.W.2d 528, 53132 (Tex. Crim. App. 1996) (State could not create a false
impression on cross-examination in order to open door to extraneous act
evidence).